PREET BHARARA
United States Attorney
Southern District of New York
By:   MARA E. TRAGER
      ELLEN M. LONDON
Assistant United States Attorneys
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2799/2737
Fax: (212) 637-2702
Email: mara.trager@usdoj.gov
       ellen.london@usdoj.gov

JUDGE BRODERICK

14 CV 9978

RECEIVED DEC 18 2014 U.S.D.C. S.D.N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

   Plaintiff,

  v.

RMD HOLDINGS, LTD,

   Defendant.

------------------------------------------------------------X

14 Civ. ____

COMPLAINT

JURY TRIAL DEMANDED

   Plaintiff United States of America (the "United States" or the "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges as follows:

## INTRODUCTION

  1. The United States files this civil complaint to recover damages and penalties from Defendant RMD Holdings, Ltd., d/b/a Nationwide Construction ("RMD" or "Defendant") under the False Claims Act and common law arising from Defendant's false representations that work on a federally-funded construction project was performed, consistent with federal regulations, by a disadvantaged business enterprise ("DBE"). Rather than hire a DBE to perform actual work on the projects as required by United States Department of Transportation ("DOT") regulations

designed to ensure the participation of DBEs in DOT-assisted contracts, Defendant fraudulently used a DBE as a pass-through to obtain contracts and subcontracts worth millions of dollars for, among other contracts, the construction of the upper and lower-level bollards outside of the LaGuardia Central Terminal building.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

3. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendant has conducted business within this District.

## PARTIES

4. Plaintiff is the United States of America.

5. Defendant RMD is a construction contractor that works on projects throughout the United States, including in the New York metropolitan area.

## BACKGROUND

6. The DOT regulations entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs" are intended to provide opportunities for businesses owned by socially and economically disadvantaged individuals, such as minorities and/or women, possessing the required skills to perform work on construction projects funded, at least in part, by the federal government. The regulations are codified at 49 C.F.R., Part 26 (the "DBE Regulations"). They are designed to "ensure nondiscrimination in the award and administration of DOT-assisted contracts in the Department's

highway, transit, and airport financial assistance programs."

7. The DBE Regulations require that every contract that a DOT funding recipient signs with a contractor include an assurance by the contractor that "[t]he contractor . . . shall carry out applicable requirements of [the DBE Regulations] in the award and administration of DOT-assisted contracts." The DBE Regulations further state that "[f]ailure to carry out these requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the recipient deems appropriate."   49 C.F.R. § 26.13(b).

8. The DBE Regulations provide that payments made to a DBE contractor may be counted toward DBE goals "only if the DBE is performing a commercially useful function on that contract."   49 C.F.R. § 26.55(c).   A "commercially useful function" is performed when a DBE is "responsible for the execution of the work of the contract and is carrying out its responsibilities by actually preforming, managing, and supervising the work involved."   *Id.* To perform a "commercially useful function," the regulations require that the DBE "be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material and installing (where applicable) and paying for the material itself."   *Id.*

9. The DBE Regulations specifically prohibit "pass-through" arrangements. Thus, a DBE does not perform a commercially useful function "if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation."   *Id.*   If a DBE does not perform or exercise responsibility for at least 30 percent of the total cost of its contract with its own work force, it is presumed that the DBE is not performing a commercially useful function.   *Id.*

10. The DBE Regulations apply equally to projects funded through the Federal

3

Aviation Administration ("FAA"), which is an agency of the DOT.   *See* 49 C.F.R. § 26.3(a).

## THE FRAUDULENT SCHEME

A.  MS Construction Co.

11. At all times relevant to this complaint, MS Construction Co. ("MS") operated as a shell company whose sole employee was its president and owner, Madeline Pepe.

12. The Defendant used MS's name and DBE status to obtain subcontracts on a number of public works projects.

13. The work on the subcontracts purportedly awarded to MS was done by RMD, not MS.

14. MS's president received a percentage of every requisition payment from the Defendant in exchange for the use of MS's DBE status.

B.  The LaGuardia Construction Project

15. The construction of the LaGuardia Central Terminal building was funded with a combination of money from the FAA and the State of New York.   The grant money was administered through the FAA's Airport Improvement Program ("FAA-AIP"), and the project was managed by the Port Authority of New York and New Jersey ("PANYNJ").   As a condition of receiving DOT funding for the LGA Project, the PANYNJ established DBE goals for the project and required the general contractor to either meet or make good-faith efforts to meet the DBE goal.

16. In August 2008, the prime contractor on the LGA Project invited other subcontractors to bid on contract number MF100.509, also known as FAA Work Order #15, to perform a portion of the work on the LaGuardia Central Terminal building project that involved the installation of the upper and lower level bollards.   (Contract number MF100.509 is hereinafter referred to as the "LGA bollard project").   In its invitation to bid on the LGA project,

the prime contractor notified potential bidders that the LGA project was subject to the DBE regulations, and that the DOT had set a 17% DBE participation goal for the contract. The invitation to bid further provided that, by bidding on the project, the subcontractor was assuring both the prime contractor and the PANYNJ that it would meet the DBE goal or would seek a waiver.

17. The total value of the LGA bollard project was $10,986,500. Thus, unless PANYNJ granted a waiver, the winning bidder was required to hire DBEs to perform at least $1,867,705 worth of work.

18. The LGA bollard project was awarded to an intermediary subcontractor which in turn entered into a $2,464,321 subcontract with RMD to perform work on the LGA bollard project. The contract between the intermediary subcontractor and RMD required RMD to provide "WBE/DBE furnished materials."

19. In connection with its award of this subcontract, RMD submitted to the intermediary subcontractor a DBE participation plan dated November 14, 2008, reflecting that MS was to supply approximately $1.1 million in bollard structural steel for the LGA project.

20. However, contrary to RMD's representation that MS was to supply steel, RMD was aware that MS would not supply the steel and that MS would perform no commercially useful function on the project. The steel was instead supplied by several third-party suppliers, none of whom were DBEs, and the paperwork necessary for procuring the steel was prepared almost entirely by RMD employees. MS did not negotiate or arrange for the purchase of the steel and had limited contact with the actual steel suppliers.

21. To perpetuate the scheme, RMD issued dual-party checks to the actual steel supplier and MS. Approximately every month, RMD would issue two checks: a dual-party check

to MS and the actual steel supplier, and a check directly to MS for roughly 5% of the value of the dual-party check to compensate MS for allowing RMD to use its name to obtain DBE credit.

22. The dual-party checks were sent to MS by an executive at RMD with explicit instructions to endorse the dual-party check and to forward it to an enclosed address, and to keep the second check.

23. As RMD was fully aware, because MS neither negotiated nor arranged for the purchase of the steel, nor did it pay for the materials itself, MS was not performing a "commercially useful function" and thus expenditures by RMD through MS could not be counted toward the DBE goal. *See* 49 C.F.R. § 26.55(c).

24. Nevertheless, RMD provided the intermediary subcontractor with invoices and other documentation purportedly from MS so that the intermediary subcontractor could claim credit toward meeting its DBE contract requirements. The payments to MS were incorporated into a report signed by the president of the intermediary subcontractor and submitted to the prime contractor to show that the intermediary subcontractor was meeting its DBE goals as required by its contract with the prime contractor.

25. The fraudulent scheme was perpetuated by both RMD employees and the owner of MS. The RMD Project Manager for the LGA project and the RMD Chief Financial Officer were, among others, aware of MS's role in the LGA project and actively participated in the fraudulent scheme. As the RMS Project Manager acknowledged, RMD may not have been awarded its subcontract without the planned participation of MS as a DBE.

## FIRST CLAIM

### Violations of the False Claims Act: Presentation of False Claims

### (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))

26. The United States incorporates by reference paragraphs 1-25 as if fully set forth in this paragraph.

27. The United States seeks relief against Defendant under Section 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A), of the False Claims Act.

28. As set forth above, in connection with the foregoing scheme, Defendant knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment to the intermediary subcontractor and to the prime contractor, both recipients of federal funds, and such funds were spent or used by these companies on the Government's behalf and to advance a Government interest. Specifically, Defendant submitted invoices to the intermediary subcontractor that reflected falsely that MS had performed work on the LGA bollard project when in fact MS had not performed such work; the intermediary subcontractor in turn used these invoices in preparing a report to the prime contractor to show that it was meeting its DBE goals.

29. By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

**Violations of the False Claims Act: Making or Using a False Record or Statement (31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))**

30. The United States incorporates by reference paragraphs 1-25 as if fully set forth in this paragraph.

31. The United States seeks relief against Defendant under Section 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act.

32. As set forth above, in connection with the foregoing scheme, Defendant knowingly, or in reckless disregard for the truth, made, used, and caused to made and used, false records and statements material to a false and fraudulent claim that was made to the intermediary subcontractor and to the prime contractor, both recipients of federal funds, and such funds were spent or used on the Government's behalf and to advance a Government interest. Specifically, Defendant submitted invoices to the intermediary subcontractor that reflected falsely that MS had performed work on the LGA bollard project when in fact MS had not performed such work; the intermediary subcontractor in turn used these invoices in preparing a report to the prime contractor to show that it was meeting its DBE goals.

33. By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## THIRD CLAIM

### Unjust Enrichment

34. The United States incorporates by reference paragraphs 1-25 as if fully set forth in this paragraph.

35. By reason of the payments to Defendant, Defendant was unjustly enriched. The circumstances of Defendant's receipt of these payments are such that, in equity and good conscience, Defendant should not retain these payments, the amount of which is to be determined at trial.

## FOURTH CLAIM

### Common Law Fraud

36. The United States incorporates by reference paragraphs 1-25 as if fully set forth in this paragraph.

37. Defendant made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, Defendant to the United States.

38. Defendant intended that the United States and/or entities receiving federal funds rely upon the accuracy of the false representations referenced above.

39. The United States made substantial payments of money in justifiable reliance upon Defendant's false representations.

40. Defendant's actions caused the United States to be damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

### Payment Under Mistake of Fact

41. The United States incorporates by reference paragraphs 1-25 as if fully set forth in this paragraph.

42. The United States seeks relief against Defendant to recover monies paid under mistake of fact.

43. The Government disbursed funds based on statements submitted by or caused to be submitted by Defendant under the erroneous belief that Defendant's statements that it was complying with DBE requirements were true.

44. Because of these payments and/or guarantees by mistake, Defendant has received monies to which it is not entitled.

45. By reason of the foregoing, the United States was damaged in a substantial amount to be determined at trial.

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor and against Defendant as follows:

(d) On the First and Second Claims for Relief (Violations of the False Claims Act), for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented and an award of costs pursuant to 31 U.S.C. § 3729(a);

(e) On the Third, Fourth, and Fifth Claims for Relief, in an amount to be determined at trial, together with costs and interest; and

(f) awarding such further relief as is proper.

Dated: New York, New York
December 18, 2014

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York
                    Attorney for Plaintiff
                    United States of America

By:                /s/ Ellen M. London
                    MARA E. TRAGER
                    ELLEN M. LONDON
                    Assistant United States Attorneys
                    86 Chambers Street
                    New York, New York   10007
                    Telephone:   (212) 637-2799/2737
                    Facsimile:   (212) 637-2750
                    Mara.Trager@usdoj.gov
                    Ellen.London@usdoj.gov